UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

     Plaintiff,

v.

CASE NO. 3:20-cv- *1350-J-20.JRK*

$306,242.49 SEIZED FROM FIFTH
THIRD BANK BUSINESS ELITE
CHECKING ACCOUNT NUMBER
7450306241, TITLED TO NATL
ORTHOPEDIC INSTITUTE INC,
NATIONAL FAMILIY MEDICAL
CENTER;

$15,087.00 SEIZED FROM FIFTH
THIRD BANK ESSENTIAL CHECKING
ACCOUNT NUMBER 7450464370,
TITLED TO THE ZEUS AND ZEUS
TRUST;

$10,821.00 IN UNITED STATES
CURRENCY;

and

$4,850.00 IN UNITED STATES
CURRENCY,

     Defendants.

_____

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

In accordance with Rule G(2) of the Supplemental Rules for Admiralty

or Maritime Claims and Asset Forfeiture Actions, Plaintiff, United States of

America brings this complaint and alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is a civil action in rem to forfeit to the United States the following:

 a.     $10,821.00 in United States currency;

 b.     $4,850.00 in United States currency,

 c.     $306,242.49 seized from Fifth Third Bank Business Elite Checking Account Number 7450306241, titled to Natl Orthopedic Institute Inc, National Family Medical Center (NFMC); and

 d.     $15,087.00 seized from Fifth Third Bank Essential Checking Account Number 7450464370, titled to The Zeus and Zeus Trust (Zeus and Zeus Trust account);

(Defendant Funds).

## THE DEFENDANTS IN REM

2.     The Defendant Funds were seized in the Middle District of Florida, and are in the Government's custody as follows:

 a.     The Drug Enforcement Administration (DEA) seized $10,821.00 and $4,850.00 in United States currency on February 12, 2020 in Jacksonville, Florida and deposited the funds into the United States Marshals Service Seized Asset Deposit Fund on February 18, 2020.

2

b.      On February 21, 2020, the Internal Revenue Service seized the

$306,242.49 and $15,087.00 from bank accounts pursuant to federal seizure

warrants issued by United States Magistrate Judge Patricia D. Barksdale in Case

Number 3:20-mj-1100-PDB.  The funds were deposited into the Treasury Suspense

Account on March 24, 2020.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil

actions commenced by the United States, and pursuant to 28 U.S.C. § 1355,

which provides the Court with jurisdiction over actions to recover or enforce

forfeitures.

4.      This Court has in rem jurisdiction over the Defendant Funds

because pertinent acts giving rise to the forfeiture occurred in the Middle District

of Florida.  28 U.S.C. § 1355(b)(1)(A).

5.      Venue properly lies in the Middle District of Florida pursuant

to 28 U.S.C. § 1395(a), because the Defendant Funds were seized within

the Middle District of Florida, Jacksonville Division.

6.      Because the Defendant Funds are in the government's

possession, custody, and control, the United States requests that this Court

issue an arrest warrant in rem, upon the filing of the complaint, pursuant to

Supplement Rule G(3)(b)(1).  Rule G(3)(b)(1) requires the Clerk to issue a

warrant of arrest in rem for defendant property if such property is in the

government's possession, custody, or control.

7.      After the Court issues the warrant of arrest in rem, the United

States will execute the warrant pursuant to 28 U.S.C. § 1355(d) and

Supplemental Rule G(3)(c).

## STATUTORY BASIS FOR FORFEITURE

8.      The Defendant Funds are subject to forfeiture to the United States,

pursuant to 21 U.S.C. § 881(a)(6), as proceeds traceable to the exchange of a

controlled substance and/or was intended to be exchanged for a controlled substance,

or was used to intended to be used to facilitate the distribution of a controlled

substance, in violation of 21 U.S.C. §§ 841 and 846.

9.      The Defendant Funds are also subject to forfeiture to the United States,

pursuant to 18 U.S.C. § 981(a)(1)(A), in that the Defendant Funds were involved in

money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), in that they were

deposited into identified accounts by an individual knowing they were the proceeds of

unlawful activity in an effort to conceal or disguise the nature, source, ownership or

control of the proceeds.  A "specified unlawful activity," as defined by 18 U.S.C.

1956(c)(7)(A) includes any offense listed in 18 U.S.C. § 1961(1); this definition

includes the felonious manufacture, importation, receiving, concealment, buying,

selling or otherwise dealing in a controlled substance of listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States." 18 U.S.C. § 1961(1)(D).

## FACTS

10.     Specific details of the facts supporting the forfeiture of the Defendant Funds have been provided by Special Agent Peter J. Corigliano, Jr. (SA Corigliano), Department of the Treasury, Internal Revenue Service – Criminal Investigation (IRS-CI), who obtained the information through investigation, reviewing documents, and communicating with witnesses and other law enforcement officers.  This investigation is being conducted jointly by the DEA, IRS-CI, the Jacksonville Sheriff's Office, and the Department of Health and Human Services. Information obtained because of the investigative effort of each agency is being shared with agents from the other agencies.

11.     The facts set forth below are not all the facts gathered by law enforcement during the investigation.  Rather, as required by Rule G(2)(f), this complaint only contains sufficient facts to support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Funds are subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

12.   SA Corigliano has been a Special Agent with IRS-CI for over 10 years.  He is assigned to the Jacksonville, Florida office.  SA Corigliano's responsibilities include the investigation of criminal violations of the Internal Revenue laws (Title 26, United States Code), Bank Secrecy Act laws (Title 31, United States Code), Money Laundering Control Act laws (Title 18, United States Code, Sections 1956 and 1957), and related offenses.

13.   SA Corigliano received extensive basic training at the Federal Law Enforcement Training Center in Glynco, Georgia. This training covered all aspects of financial investigations. He has been assigned to or has assisted other special agents of IRS-CI in numerous investigations involving the laundering of proceeds from various specified unlawful activities (SUAs), such as public corruption, illegal gambling, wire fraud, mail fraud, healthcare fraud, and drug trafficking, and the concealment of assets purchased with these unlawful proceeds.

14.   SA Corigliano is assigned to the DEA–Jacksonville District Office as a Task Force Agent.  As such, he investigates and is involved in the prosecution of individuals engaged in the illegal trafficking and distribution of narcotics and controlled substances, as well as complex financial crimes related to narcotics trafficking.

## INVESTIGATION

15.     Stevey Lamont Barnes owns and operates the National Family Medical Center (NFMC), located in Jacksonville, Florida.

16.     The investigation has shown that NFMC is a medical facility which Barnes has been using since approximately 2008 to facilitate the distribution of Schedule II narcotics, in violation of 21 U.S.C. §§ 841 and 846. Additionally, Barnes has been distributing diverted scheduled narcotics from his residence since at least 2015.

17.     Barnes was convicted on May 19, 2000, in the Circuit Court in Duval County, Florida, of one charge of Schemes to Defraud and one charge of Attempting to Practice Medicine without an Active License.

### DEA Confidential Sources

18.     SA Corigliano received information from DEA agents regarding their debriefings of confidential sources, CS1 and CS2. These confidential sources provided historical information and worked in a proactive capacity at the direction of law enforcement.

19.     Further, CS3 is an employee at the NFMC and was approached by law enforcement seeking information regarding Stevey Lamont Barnes and the NFMC. CS3 cooperated with law enforcement due to concern with the

activity taking place at NFMC and at this point in the investigation appears to have no connection with the unlawful activity occurring at NFMC.

## The Narcotics Investigation

20.    On May 15, 2019, CS1 contacted DEA agents and stated that CS2 invited CS1 to meet with a doctor who was capable of diverting large quantities of prescription narcotics.  CS1 informed DEA agents that the initial meeting would involve only a discussion of the diversion and sale of prescription narcotics.

21.    On May 15, 2019, DEA agents provided CS1 with an audio and video recording device and instructed CS1 to gather intelligence and report back.

22.    Following the meeting with Barnes, CS1 reported by phone to the DEA agents that during the meeting, Barnes unexpectedly provided CS1 with two pill bottles containing what CS1 believed to be oxycodone. DEA agents met with CS1 and recovered the audio/video recording device containing the recording of the meeting between CS1, CS2, and Barnes and two prescription pill bottles containing 359, 30mg oxycodone pills.

23.    At a later interview, CS1 informed DEA agents that on the way to Barnes' residence, CS2 consistently referred to Barnes as a doctor and used the term "Dr. Barnes." CS2 informed CS1 that "Dr. Barnes" would be able to

provide CS1 with legitimate prescriptions for scheduled narcotics. CS2 informed CS1 that Barnes likes to use code names for the members of his drug trafficking organization (DTO). CS2 informed CS1 that Barnes prefers to utilize superhero names and that Barnes refers to himself as "Batman", and to CS2 as "Thor."

24.     CS1 stated that at Barnes' home, Barnes escorted CS1 and CS2 to a home theater room where they sat down to talk. During the meeting, Barnes detailed the workings of his DTO.  Barnes informed CS1 that he owned a medical clinic and that several members of the DTO were provided diverted narcotics by Barnes to sell for profit. Barnes detailed the process by which CS1 would become a patient at Barnes' clinic. Barnes stated he would ensure that CS1 would receive prescriptions for controlled substances from the doctors at Barnes' clinic.

25.     CS1 stated that Barnes unexpectedly provided CS1 three pill bottles containing oxycodone pills, a schedule II controlled substance. Barnes told CS1 that he expected to be paid $25 per pill for a total of $9,000 and that the other members of the DTO were selling the pills for $30 to $35 each. Barnes agreed to get CS1 into his clinic the following day to begin the process of establishing a medical record that would allow CS1 to receive prescriptions for scheduled narcotics, which CSI would later sell.  Barnes told CS1 that

steps would be taken to ensure that CS1 would obtain prescriptions for scheduled narcotics in a manner which would not alert law enforcement.

26.    DEA agents reviewed the audio and video of the meeting on May 15, 2019, between CS1, CS2, and Barnes.  During the review of the recording, DEA agents corroborated what the information CS1 provided about the meeting.

27.    One of the pill bottles provided by Barnes to CS1 had a partially scratched off label remaining on it.  DEA agents observed that the partial label from the bottle showed that the prescription was written to a patient named G. A. and the prescription number of XXXX8183.  Utilizing the Florida prescription monitoring program database, DEA agents were able to determine that Dr. J. B., who is employed by Barnes at NFMC, prescribed 30mg Oxycodone to G.A. on May 13, 2019. The schedule II narcotic, Oxycodone 30mg, that was prescribed to G.A. at NFMC is the same medication and dosage that were provided to CS1 by Barnes on May 15, 2019.

28.    On May 16, 2019, DEA agents instructed CS1 to go to NFMC for CS1's initial appointment in order to begin the process of obtaining prescriptions for scheduled narcotics as Barnes had detailed the previous night.[1]

---

[1] As discussed further below, CS1 scheduled several other visits to NFMC.  Before each visit, DEA agents determined he/she had no contraband and also confirmed the occurrence of the meetings as

29.     DEA agents later interviewed CS1 and he reported that on May 16, 2019, he walked into the doctor's office, was greeted by Barnes and began filling out standard medical paperwork.  CS1 stated that all of the staff in the office referred to Barnes as a doctor. CS1 informed Barnes that CS1 could pay Barnes $1,500 now as a show of good faith, but Barnes told CS1 to pay him later.  Barnes informed CS1 that the visit would cost $500 cash and asked CS1 when CS1 would be paying for the pills CS1 received from Barnes the previous evening at Barnes' house.

30.     CS1, at the instruction of DEA agents, returned to NFMC on May 20, 2019 for a follow-up appointment he/she had scheduled on May 16, 2020.  DEA agents provided CS1 with $1,500 in official funds for the purpose of paying NFMC's fee to see the doctor.[2]

31.     CS1 reported to DEA agents in a later interview that on on May 20, 2019, CS1 returned to NFMC for an appointment with the doctor. Prior to seeing the doctor, Barnes pulled CS1 aside and instructed CS1 on what to say to the doctor regarding pain medication. CS1 paid the nurse at the NFMC $500 for the visit prior to meeting with the doctor.

---

well as the substance of the meetings through audio/video recordings and through surveillance.

[2] DEA agents later recovered the remaining official funds of $1,000 from CS1 after payment of $500 to the NFMC for the doctor visit.

32.     CS1 was seen by Dr. J.B., the same doctor who prescribed the medication provided to CS1 by Barnes on May 15, 2019 at their initial meeting at Barnes' residence. CS1 reported the doctor asked about a prior car accident and some basic health history but did not review an MRI or conduct any type of range of motion diagnosis. Following the visit, CS1 observed Barnes instruct Dr. J.B. what to prescribe the CS1.

33.     DEA agents instructed CS1 on May 21, 2019, CS1 to place a recorded phone call to Barnes.  DEA agents reviewed the recording of the phone call between CS1 and Barnes.  During the phone call, Barnes and CS1 discussed, in coded language, the going retail prices of diverted prescription narcotics.  Barnes informs CS1 that other members of the DTO are selling oxycodone and having no problem selling pills for over $30 per pill.  Barnes tells CS1 that he sells the pills at a bulk price of $25 each so that he does not have to deal with one on one sales.

34.     On May 23, 2019, DEA agents directed CS1 to meet with Barnes at NFMC in order to pay Barnes for a portion of the money CS1 owed to Barnes for the pills he provided to CS1 on May 15, 2019 at Barnes' house.

35.     Prior to the meeting, DEA agents provided CS1 with $7,000 in official funds. CS1 reported to DEA agents after the meeting that on May 23, 2019, CS1 met with Barnes at the NFMC for the purpose of paying Barnes

$7,000 in official funds for the oxycodone pills that Barnes provided CS1 on May 15, 2019.

36.     CS1 stated that during the meeting with Barnes, Barnes informed CS1 that CS1 needs to come into the NFMC every month to "show his/her face" so that the medical record would look legitimate. CS1 stated that CS1 handed Barnes $7000 cash and that Barnes accepted the payment for the oxycodone pills. CS1 stated that Barnes discussed the price at which the CS1 was selling the pills and that Barnes told CS1 that he knew he would be able to sell the pills easily.

37.     CS1 stated Barnes informed CS1 that Barnes could provide CS1 with five more bottles of pills later in the day and informed CS1 that CS1 could pay him the remainder of the money owed the following week.

38.     On June 10, 2019, DEA agents directed CS1 to meet with Barnes at NFMC in order to pay Barnes $2,000, which was the remainder of the money owed to Barnes for the pills he provided on May 15, 2019.  CS1 was provided with $2,000 in official funds for the purpose of payment to Barnes.

39.     On June 10, 2019, DEA agents conducted a debriefing interview of CS1 who stated that on June 10, 2019, he/she met with Barnes at the NFMC and paid him $2,000 in official funds. CS1 informed Barnes that it was

the remainder of the money for the pills CS1 received from Barnes on May 15, 2019. BARNES accepted the money.

40.    On September 10, 2019, DEA agents interviewed CS2, a former member of the Barnes DTO. CS2 stated that CS2 met Barnes through a mutual friend and knows Barnes to be the owner of the NFMC. CS2 had been receiving prescriptions for high amounts of opioids and benzodiazepines on a monthly basis for the last 7-8 years as a patient of the NFMC, which was corroborated utilizing the Electronic-Florida Online Reporting of Controlled Substances (EFORCSE) database.

41.    CS2 stated that Barnes diverts scheduled narcotics prescribed at NFMC to a network of distributors including CS2. The diverted narcotics are from prescriptions issued by doctors at NFMC to patients who then fill them at different pharmacies and return the diverted pills to Barnes. CS2 is privy to this information through conversations with Barnes and through picking up diverted scheduled narcotics from Barnes at Barnes' residence and selling them for profit for approximately the past four and one-half years.

42.    On January 6 and 9, 2020, DEA agents interviewed CS3, an employee at the NFMC. CS3 has been employed by Barnes at the NFMC from September 2018 to present. Because of CS3's employment and position

at the NFMC, CS3 possess intimate knowledge of the workings of the NFMC and activities of Barnes.

43.     CS3 stated Barnes refers to himself as "Dr. Barnes" and portrays himself as a doctor to pharmacists and patients. CS3 stated Barnes, acting as a doctor, has seen patients on several occasions and Barnes will dress in medical attire, such as scrubs when seeing patients. CS3 stated that Barnes, when acting as a doctor, will personally write prescriptions for patients, and, later, a real doctor would sign the prescriptions without seeing the patient.

44.     CS3 stated that NFMC does not take patient referrals from outside doctors and will not take walk-in patients.  CS3 stated the same people were always patients at NFMC. They came on a monthly basis, and were all related to Barnes or knew Barnes him on a personal level. CS3 stated that many of the patients provided services for Barnes, such as construction work, plumbing services, car services, etc., in order to get access to the clinic.  Barnes referred to the people whom he allowed to come to the NFMC as "family" or "the family."

45.     CS3 stated that in early 2019, an insurance provider listed the NFMC as a medical provider in network on their website. The NFMC began getting calls from potential new patients, which bothered Barnes because Barnes does not accept patients he does not know. Barnes eventually called

the insurance company and asked to be removed from the network provider list in order to avoid walk-ins or new patients.

46.     CS3 stated that in order to see the doctor, patients must pay a $500 cash fee to the NFMC, unless they provide services to Barnes in lieu of payment.  Many of the patients are on Medicare or Medicaid and yet still pay the $500 fee to see the doctor.  CS3 stated the cash payment is received during the intake phase and is collected by CS3.

47.     CS3 stated many patients come to the office together in the same vehicle and know each other personally. CS3 stated that these patients initially attempted to hide the fact that they had come for appointments as a group but, as time passed, began to speak openly in front of CS3 about their relationship. Patients, at times, also see the doctor and then have a friend or associate bring the $500 fee at later time before they receive their prescriptions.

48.     CS3 stated that the vast majority of the patients who are seen at NFMC receive prescriptions for large quantities of controlled substances including opioids, amphetamines, and benzodiazepines.

49.     CS3 has observed, on multiple occasions, Barnes ordering doctors at the NFMC to change prescriptions when patients have complained about their dosage being reduced. CS3 stated that Barnes' wife, told CS3 that

Dr. J.B. left the clinic because he was tired of Barnes bullying him into changing prescriptions.

50.    CS3 stated that C.B.C., a former patient of NFMC, died of a drug overdose in December 2018. DEA agents were able to locate a C.B.C., in the DAVID database, who died on December 26, 2018. Utilizing the EFORCSE database, SA Corigliano reviewed a report and was able to corroborate that C.B.C. was a patient at the NFMC, where he regularly received prescriptions for large quantities of multiple controlled substances including oxycodone, morphine, and alprazolam.

51.    An official at the Jacksonville Sheriff's Office (JSO) informed DEA agents that C.B.C. died on December 26, 2018, of a drug overdose. DEA agents obtained and reviewed the investigation report, medical examiners report, and crime scene photographs.

52.    The medical examiner's report, based on a December 27, 2018 autopsy, revealed that C.B.C. died of "Multiple drug toxicity (Morphine, Oxycodone)."

53.    DEA agents reviewed the crime scene photographs taken by JSO and were able to identify several pill bottles on the dresser in which the body of C.B.C. was located. One bottle was a prescription for 60, 100mg morphine

pills prescribed by Dr. R. K., who worked at NFMC and filled on December 10, 2018.

54.    DEA agents conducted a review of the EFORCSE database which showed that C.B.C. had been prescribed both morphine and oxycodone at the NFMC by Dr. R.K. and Dr. W.M.

55.    On January 22, 2020, CS1 was contacted by Barnes via text message. In the text messages, which your affiant has reviewed, Barnes tells CS1 "The contractors are at the house, call b4 coming." In prior meetings between CS1 and Barnes, Barnes has used coded language and referred to bottles of prescription narcotic pills as "contracts."

56.    On January 23, 2020, CS1 placed a recorded phone call, in the presence of DEA agents, to Barnes to coordinate a time and place for CS1 to pick up diverted prescription narcotics from Barnes. During the phone call, Barnes informed CS1 that he has four "packages" for CS1 and will meet CS1 at Barnes' residence in twenty minutes.

57.    Following CS1's meeting with Barnes on January 23, 2020, DEA agents recovered two prescription pill bottles containing 453, 30mg oxycodone pills from CS1.  In a debriefing interview of CS1, DEA agents learned that on January 23, 2020, CS1 met with Barnes at Barnes' residence. CS1 stated that

Barnes provided CS1 with two pill bottles containing a large quantity of pills, and Barnes removed the labels prior to handing the bottles to CS1.

58.     DEA agents reviewed the audio and video recording of this meeting and observed and heard the following.  CS1 entered Barnes' residence and sat with Barnes, who proceeded to divide pills from four separate prescription bottles into two bottles.  Barnes then removed the labels from the exterior of the pill bottles and told CS1 that the price was $25 per pill.  Barnes informed CS1 that he has more pills when CS1 needs them and that he diverts the prescriptions that his mother in-law receives. Barnes then gave CS1 453 oxycodone 30mg pills. CS1 asked Barnes about the new doctor working at the NFMC. Barnes stated that the new doctor, Dr. K., does exactly what Barnes needs and does not ask any questions.  Barnes further stated that if CS1 continues to come to the NFMC that Barnes can ensure CS1 receives prescriptions for amounts of 120 oxycodone pills instead of the 90 count that CS1 has been receiving.

59.     DEA agents observed that the label on one of the pill bottles given to CS1 by Barnes had not been completely removed by Barnes and the patient name, M.P., and a partial prescription number was still visible. Utilizing the Florida prescription monitoring program database, DEA agents determined that Dr. O. K., employed by Barnes at the NFMC, prescribed 120

30mg Oxycodone to M.P. on January 13, 2020, with a matching prescription number. The schedule II narcotic, Oxycodone 30mg, prescribed to M.P. at NFMC is the same medication and dosage provided to CS1 by Barnes at their meeting on January 23, 2020.

60.     On February 12, 2020, law enforcement officers executed a federal search warrant at Barnes residence at Carbondale Drive North, Jacksonville, Florida. During the search, law enforcement seized several prescription bottles in the name of a non-resident of the Carbondale Drive address throughout the residence. They also seized $10,281.00 (part of the Defendant Funds) from inside a black brief case belonging to Barnes, and several firearms located throughout the residence.

61.     Upon Barnes' departure from the residence, law enforcement officers conducted a traffic stop on the vehicle he was driving. They arrested Barnes on an active state arrest warrant for Trafficking More than Seven grams of Oxycodone. That case remains pending in state court. The law enforcement officers located a total of $4,850.00 (also part of the Defendant Funds) from a briefcase inside the vehicle and Barnes's pants pockets. The majority of the currency consisted of $20 bills and was bundled with rubber bands.

62.     On February 21, 2020, agents obtained seizure warrants for the Fifth Third bank accounts described in paragraph 1 a. above.

## FINANCIAL INVESTIGATION

63.     In summary of the financial investigation described below, SA Corigliano has learned that the Subject Funds are the proceeds of, and/or where used to facilitate, the illegal distribution of Schedule II narcotics— illegally prescribed pain pills.  The overwhelming majority of patients at NFMC used the facility to illegally obtain prescription drugs.  They paid Barnes and NFMC hundreds of dollars in cash for each appointment and members of Barnes' drug trafficking organization also returned proceeds from the sale of illegal narcotics back to Barnes.  Further, Barnes structured the cash he received through the NFMC Account and through the Zeus and Zeus Trust account.

### Interview of CS3

64.     On February 12, 2020, SA Corigliano along with a JSO Detective, interviewed CS3, the employee of NFMC, regarding the financial activities of Barnes and the NFMC.

65.     CS3 reported that, on average, ten patients per day arrive at NFMC to obtain prescriptions for large quantities of controlled substances including opioids, amphetamines, and benzodiazepines.  These patients pay

$400 to $500 in cash per visit, with the majority required to pay $500 per visit.
CS3 stated that there might be one patient per week not receiving a
prescription for pain pills.  CS3 stated the NFMC on average has $5,000 cash
at the end of the day from the daily patients.

66.     CS3 stated the patients are required to pay the cash regardless of
whether they possess insurance.  Almost without exception, if the patient does
not make the cash payment, he or she will not receive a prescription for the
pain pills; however,   CS3 is aware of some patients who did not pay cash but,
rather, provided some type of service for Barnes.  CS3 specifically mentioned a
patient named C.G. who worked on a wall at Barnes' residence.

67.     CS3 was unaware of any records NFMC and Barnes retain to
track cash payments made by patients for prescription pain pills.  CS3 stated
that there is a calendar/scheduling book showing which patients are seen each
day.  CS3 stated the patient's files contain a small sticker that shows how
much cash the patient is to pay for the visit.

68.     CS3 is unaware of Barnes tracking these payments on any
written ledger or on a computer.

69.     CS3 stated he/she had conversations with Barnes wherein Barnes
stated he expects to bring in $5,000 cash each day.  CS3 stated at the end of
each day, Barnes takes the cash and places it in a small zippered bank bag,

which he then places in a black bag.  Barnes leaves the NFMC each day with the cash.

70.    SA Corigliano asked CS3 whether Barnes kept cash at his residence. CS3 said that after the first week of his/her employment, they went to Barnes' residence where he/she was paid $800 cash.

71.    CS3 was aware of Barnes having bank accounts at Fifth Third Bank. CS3 provided me with a paycheck to review, which was drawn on Fifth Third Bank account number 7450306241, titled to National Family Medical Ct., National Orthopedic Institute, Inc.[3] CS3 was also aware of Barnes having an account titled Zeus and Zeus Trust.  CS3 overheard Barnes in a phone conversation in which Barnes explained that Zeus and Zeus Trust is related to the building housing the NFMC.  Barnes said on the phone that Zeus and Zeus Trust exists because people do not want him owning a building on Beach Boulevard, so he needed to put it under the Zeus and Zeus Trust name. Additionally, CS3 could not think of a reason for cash from the NFMC business being deposited into the Zeus and Zeus Trust bank account.  CS3 has never deposited cash on behalf of Barnes.

---

[3] The bank statements and signature card state that the account name is Natl Orthopedic Institute Inc, National Family Medical Center.  The checks drawn from this same account show the account name as National Family Medical Ct., National Orthopedic Institute, Inc.

### Search Warrant at the NFMC

72.     On February 12, 2020, investigating law enforcement officers executed a federal search warrant at the NFMC.  Computers, documents, and other items were seized as evidence.  The evidence seized included, among other things, the NFMC calendar/scheduling book described by CS3, which lists patients seen each day.  SA Corigliano reviewed the NFMC calendar/scheduling book from January 1, 2019 through February 11, 2020.  Based on the review, he was able to determine the NFMC averaged approximately nine patients per business day.

> **$306,242.49 seized from Fifth Third Bank Business Elite Checking Account Number 7450306241, titled to Natl Orthopedic Institute Inc, National Family Medical Center; (NFMC Account)**

73.     The NFMC account was opened on or about June 10, 2011.  The signor on the account is Stevey Barnes.

74.     As background, a review of account activity for the period September 15, 2018 to January 7, 2020, revealed 71 cash deposits totaling $470,274.00.  During the period of February 22, 2019 through January 7, 2020, $326,890.00 in cash deposits were made into the NFMC Account.  There were a few checks deposited into the account during this period, primarily from insurance companies; however, the overwhelming majority of

the deposits into the NFMC Account consisted of cash deposits derived from the sale of illegal narcotics.

75.     As of February 12, 2020, there was approximately $306,242.49 left in the account.  These funds, consisting of criminal proceeds, are subject to forfeiture as fungible property under 18 U.S.C. § 984.

76.     In summary, as previously noted above, CS3 stated essentially the only patients seen at NFMC came for prescriptions for pain medications.  They paid $400 - $500 cash each visit to receive a prescription.  CS3 indicated there was roughly only 1 out of approximately 45 patients seen at the clinic each week not receiving a prescription for pain pills.  CS1 detailed how Barnes diverted narcotics through the NFMC by making it appear as though the cash was from a legitimate doctor/patient relationship.  In undercover meetings conducted by CS1 and CS2, Barnes is heard and or observed discussing his role as the owner and operator of the NFMC and the means by which Barnes was able to divert scheduled narcotics and ensure that patients are prescribed large quantities of prescription narcotics without alerting law enforcement.  During an undercover meeting with CS1, Barnes was heard and or observed informing CS1 that each visit with the doctor would cost $500 cash.  On two separate occasions (May 23, 2019 and June 10, 2019) CS2 met with Barnes at the NFMC to make cash payments to Barnes for oxycodone pills Barnes provided

to CS2 on May 15, 2019.  The payments consisted of a $7,000 cash payment on May 23, 2019 and a $2,000 cash payment on June 10, 2019.

77.   Also, as discussed above, CS3 reported that NFMC did not keep records of cash received from patients.  Based on your affiant's knowledge and experience in reviewing business records, it is unusual for a business to not keep detailed payment records to track business income for taxation purposes. Furthermore, lax business record keeping is often a tactic utilized to conceal illegitimate business activity to make it more difficult for investigators to identify ill-gotten gains.  Without CS3 detailing the way he/she can track the patient's payment, it would be difficult at best to identify the amount of a cash payment made by a patient for the prescription pain pills.

78.   These factors, in addition to the other evidence developed during this investigation, establishes probable cause to believe that the cash deposited into the NFMC Account consisted of proceeds of the diversion of controlled substances in violation of 21 U.S.C. § 841 and also that the funds were involved in money laundering.  The deposits were made into the NFMC, presenting as the account of a legitimate medical clinic, to conceal the true source of the cash being deposited into the account, in violation of the 18

U.S.C. § 1956(a)(1)(B)(i).  Thus, the funds are subject to civil forfeiture,

pursuant to 21 U.S.C. §§ 881(a)(6) and 18 U. S. C. § 981 (a)(1)(A), respectively.

79.    Pursuant to 18 U.S.C. § 984, all of the funds remaining in this

account up to $326,890.00 are subject to civil forfeiture.  This is so because

section 984 provides that in any civil forfeiture in which the subject property

consists of funds deposited in an account in a financial institution, any identical

property found in the same account as the property involved in the offense that is

the basis for the forfeiture shall be subject to forfeiture to the extent the funds

involved in the offense were located in the year preceding the seizure.

**$15,087.00 seized from Fifth Third Bank Essential Checking
Account Number 7450464370, titled to The Zeus and Zeus Trust;
(Zeus and  Zeus Trust account).**

80.    The Zeus and Zeus Trust Account was opened on or about

October 15, 2012.  The signor on the account was listed as Stevey Barnes.  On

or about March 23, 2016, Frankie Barnes was added as an authorized signor.

81.    SA Corigliano reviewed the account activity from September 15,

2018 to January 7, 2020, and observed 6 cash deposits totaling $15,087.00.

These were made on May 16, 2019, May 22, 2019, May 23, 2019, September

14, 2019, September 23, 2019, and September 25, 2019.  During his review of

the bank records of the NFMC Account and the Zeus and Zeus Trust Account

4370, SA Corigliano observed that Barnes would, at times, split cash deposits between the NFMC Account and the Zeus & Zeus Trust Account.

82.    As previously mentioned, CS3 could think of no reason for cash from the NFMC business, which by its nature was illegal, being deposited into the Zeus and Zeus Trust account.  Also, as mentioned above, CS3 overheard Barnes talking on the phone that Zeus and Zeus Trust is related to the building the NFMC is located in and that Barnes said on the phone that Zeus and Zeus Trust exists because people do not want him owning a building on Beach Boulevard, so he needed to put it under the Zeus and Zeus Trust name.

83.    Based on these factors, in addition to the other evidence developed during this investigation, SA Corigliano believes the Zeus & Zeus Trust Account also was being utilized to receive deposits of drug proceeds. Therefore, probable cause exists for forfeiture $15,087.00 seized from the Zeus & Zeus Trust Account, pursuant to  21 U.S.C. § 881(a)(6) and also pursuant to 18 U.S.C. § 981(a)(1)(A) as laundered funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), since the funds were deposited into this account to disguise their source and origin.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of America, requests that this Court initiate a process of forfeiture against the Defendant

Funds, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed.

The United States further requests that the Court order the Defendant Funds forfeited to the United States for disposition according to law, and that the United States have such other relief as this case may require.

Dated: December 2, 2020              Respectfully submitted,

                                     MARIA CHAPA LOPEZ
                                     United States Attorney

                          By:        *Bonnie A. Glober*

                                     BONNIE A. GLOBER
                                     Florida Bar No. 0748307
                                     Assistant United States Attorney
                                     300 N. Hogan Street, Suite 700
                                     Jacksonville, Florida 32202
                                     Telephone: (904) 301-6300
                                     Facsimile: (904) 301-6310
                                     E-mail: bonnie.glober@usdoj.gov

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Peter J. Corigliano, Jr., declare under the penalty of perjury, that I am a Special Agent with United States Department of the Treasury, Internal Revenue Service – Criminal Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my knowledge and belief.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and through information conveyed to me by other law enforcement officers, as well as information contained in the official files and records of the United States.

Executed this _2_ day of _December_ 2020.

_____
PETER J. CORIGLIANO, JR.
Special Agent
Internal Revenue Service

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**DEFENDANTS**

$306,242.49 seized from Fifth Third Bank Business Elite Checking Account Number 7450306241, et al.

**3:20-CV-1350-J-20-JRK**

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
AUSA Bonnie A. Glober, U.S. Attorney's Office, 300 N. Hogan Street, Suite 700, Jacksonville, FL 32202  (904) 301-6300

Attorneys (If Known)
Nah-Deh Simmons, Esquire, P.O. Box 41083, Jacksonville, FL 32203-1083 (904) 545-9044

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☒ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21 U.S.C. 841 and 846; 18 U.S.C. 981(a)(1)(A)

Brief description of cause:
civil forfeiture in rem

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
12/2/20

SIGNATURE OF ATTORNEY OF RECORD
*Bonnie A. Glober*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE 20   MAG. JUDGE JRK